# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ALEXIS STOMBAUGH,<br><br>Plaintiff,<br><br>v.<br><br>ASHBURN HOMES, INC. and SOBROOK, LLC,<br><br>Defendants.<br><br>ASHBURN HOMES, INC. and SOBROOK, LLC,<br><br>Counterclaim Plaintiffs,<br><br>v.<br><br>ALEXIS STOMBAUGH,<br><br>Counterclaim Defendant. | C.A. No. 2022-0076-CDW |

## POSTTRIAL REPORT

Date Submitted: February 26, 2026
Date Decided: July 8, 2026

Gary R. Dodge, CURLEY, DODGE, FITZGERALD & FUNK, LLC, Dover, Delaware; Patrick C. Gallagher, JACOBS & CRUMPLAR, P.A., New Castle, Delaware; *Counsel for Plaintiff and Counterclaim Defendant Alexis Stombaugh*

Peter K. Schaeffer, Jr., AVENUE LAW, Dover, Delaware; *Counsel for Defendants and Counterclaim Plaintiffs Ashburn Homes, Inc. and Sobrook, LLC*

**WRIGHT, M.**

This is a case that should not have gone to trial. A buyer entered into a contract with a developer to buy a home that the developer would build. An executed addendum to the contract forbade the developer from escalating the purchase price of the property after breaking ground. The developer did it anyway. The buyer sought answers but received no response from the developer. Instead, the developer wrongly accused the buyer of breaching the contract and purported to terminate the contract unilaterally.

Before, during, and after trial, the defendants dug in their heels. They dismissed any notion of responsibility and continued to maintain that everything they did was within their rights. Defendants' owner, in an attempted "gotcha," asserted that the wrongful escalation was retracted when it never was. He put this whole dispute at the feet of his counsel and the buyer.

In this posttrial report, I conclude that the contracting defendant breached the contract between the parties without justification and the buyer is, therefore, entitled to specific performance. I further recommend that the buyer's attorney fees be shifted to the defendants.

# I.    BACKGROUND

These are the facts as the court finds them after trial.  The facts are drawn from 54 trial exhibits (including two deposition transcripts) and live testimony from eight fact witnesses and two expert witnesses.[1]

## A.    The Parties

Plaintiff and counterclaim defendant Alexis Stombaugh ("Stombaugh") is a Delaware resident who, in 2020, was looking to buy a home in Kent County.[2]    Defendant and counterclaim plaintiff Ashburn Homes, Inc. ("Ashburn") is a property-development company that builds homes in Kent County.[3] Defendant and counterclaim plaintiff Sobrook, LLC ("Sobrook") is a holding company that owns the land in Riverview that Ashburn developed.[4] Nonparty Jordan Ashburn ("Mr. Ashburn") is the owner of Ashburn and Sobrook's managing member.[5]

---

[1] Volume I of the trial transcript (pages 1–272) is at Docket Number 65, and Volume II of the trial transcript (pages 273–382) is at Docket Number 80. Trial transcript citations are in the form of "Trial Tr. ___."  The parties did not submit a single set of joint trial exhibits, so trial exhibits are cited as "PX __" and "DX __."

[2] *See* Trial Tr. 13–16, 70–71.

[3] *See id.* 153–155.

[4] *See id.* 154, 303.

[5] *Id.* 303.

## B.     Stombaugh Picks the Property

Stombaugh focused her search for a home on the Riverview subdivision of Frederica, Delaware, where Ashburn was building homes.[6] Ashburn worked with Rush Home Realty to list its Riverview homes for sale.[7] Ashburn only communicated to buyers of its homes through its realtors.[8]

By mid-January 2021, Stombaugh had selected a lot in Riverside and a model home to be built on the lot ("Property").[9] She worked with Rush Homes Realty, through its agents, Bert Ferguson ("Ferguson") and Marcus Rush ("Rush"), to execute the sale of the lot and construction of the Property.[10] During this period, Ferguson requested information on specific "options, upgrades and other selections," for the Property, including "tile selections for the master bathroom for the [Property]."[11] Stombaugh provided the requested information and, on January 28, selected tiling for the master bathroom.[12]

---

[6] *Id.* 15–16.

[7] *Id.* 155, 158.

[8] *See id.* 324.

[9] *See id.* 17–18.

[10] *See id.* 40.

[11] Pl. Alexis Stombaugh's Opening Post Trial Br. ("Pl.'s Opening Br."), Dkt. 71 at 3 (citing Trial Tr. 18).

[12] PX 21 at P-389.

Stombaugh made her tiling selection by sending a picture of a different Ashburn home's shower tiling to Ferguson.[13] She chose "the Calcutta tile, [a] white tile with gray veining."[14] Ferguson confirmed that her tile selection would be reflected in the eventual contract for the Property.[15]

### 1.     The Agreement of Sale

On March 3, the parties executed the Agreement of Sale for the purchase of the Property ("Agreement").[16] The Agreement reflects a base purchase price of $334,900 and a total price (including options and discounts) of $350,411.[17]

The Agreement "emphasize[s] that time is of the essence for" two parts of the transaction:  (1) Stombaugh's mortgage application and commitment; and (2) Stombaugh's option selections for the home.[18] The Agreement requires options for the home to be selected "within 14 days" of the Agreement's execution.[19] Stombaugh's failure to comply with these deadlines constitutes a default on the agreement.[20]  If Stombaugh defaults, the Agreement gives Ashburn the right to (1) cancel the transaction and retain Stombaugh's deposit,

---

[13] *See* Trial Tr. 19–20; *see also* PX 21.

[14] *See* Trial Tr. 23, 42.

[15] PX 21 at P-389.

[16] PX 11 at P-332 to P-341.

[17] Agreement ¶ 5.

[18] *Id.* ¶ 7.

[19] *Id.* ¶ 7(2).

[20] *Id.* ¶¶ 15, 20.

(2) seek specific performance of the Agreement, and (3) exercise any other right or remedy available at law.[21]

Additionally, the Agreement gives Ashburn discretion to terminate the contract in three situations: (1) "[Ashburn] determine[s] that [Stombaugh's] Mortgage Approval: (a) does not meet the requirements of this Agreement; (b) was not obtained within the required time; (c) is conditional or non-binding; or (d) [Stombaugh] do[es] not make a reasonable effort to obtain a mortgage;" (2) "[Ashburn] determine[s] that for reasons beyond [its] control, [Ashburn] cannot achieve Substantial Completion within a reasonable period of time after the Estimated Date of Substantial Completion; or" (3) "[Ashburn] [is] not able to obtain all necessary public or private approvals and permits within a reasonable time."[22] If Ashburn terminates the Agreement and Stombaugh is not at fault, Ashburn must return to Stombaugh whatever money she actually paid.[23]

### 2. The Addendums

The parties executed several addendums with the Agreement, three of which are important here. First, the parties executed the Addendum to Contract for Sale and Purchase, which reflected the options and selections Stombaugh

---

[21] *Id.* ¶ 15.

[22] *Id.* ¶ 16.

[23] *Id.*

chose for the Property.[24]  Second, the parties executed the "Selection Time Limit Addendum," which gave the deadlines for Stombaugh's selections in order "to eliminate any additional costs and to best meet completion schedules."[25]  The Selection Time Limit Addendum also reflects Ashburn's commitment to scheduling four specific meetings with Stombaugh before settlement of the Property.[26]  These meetings included a pre-drywall meeting.[27]  Third, the parties executed the "Price Escalation Addendum."[28]  This addendum explains that, although "an escalation charge may be added to [Stombaugh's] purchase price prior to the start of construction . . . [,] [n]o additional escalation charges will be added once [Ashburn] ha[s] broken ground on the start of construction."[29]  As with the Agreement, the parties executed these addendums on March 3, 2021.[30]

---

[24] PX 11 at P-347.  Stombaugh included an additional form, dated January 22, 2021, which reflects her tiling selection.  PX 13.  This form and the Addendum to Contract for Sale and Purchase describe Stombaugh's tile section only as "4x6 tile."  They do not provide the color of the tiling or that the tiling is "Calcutta" tiling. *See* PX 11, 13.

[25] PX 11 at P-342 to P-343.  Relevant here, the addendum says "<u>All</u> options must be submitted within 14 days after the Agreement of Sale is ratified." *Id.* at P-342.  It essentially duplicates the 14-day options deadline language in the Agreement. *See* Agreement ¶ 7.

[26] Selection Time Limit Addendum at P-342.

[27] *Id.*

[28] PX 12.

[29] Price Escalation Addendum.

[30] *See* Agreement at P-343, P-347; Price Escalation Addendum.

## C.   Stombaugh Prepares for Closing

Stombaugh selected color options for the home on March 7, during a meeting with Ferguson.[31]  At the meeting, Ferguson did not inform Stombaugh of any other options that she needed to make.[32]  To Stombaugh, her transaction was proceeding as planned.

Stombaugh obtained a mortgage commitment on March 10.[33]   The mortgage bore an interest rate of 2.750% and was locked for the duration of the commitment, which expired on April 2, 2021.[34]  Stombaugh timely submitted the mortgage commitment and nobody from Ashburn or Rush Home Realty notified her of any issues with the mortgage.[35]

On August 17, Stombaugh met with Ferguson and Rush for a pre-construction meeting at the Property.[36]  By then, Ashburn had broken ground on the Property.[37]  At the meeting, Rush asked Stombaugh if she had met with nonparty L&L Tile Company ("L&L") to make her carpeting and tile

---

[31] Trial Tr. 37.

[32] *Id*.  This is consistent with testimony from Ashburn's representative, Jacqueline McCann ("McCann"), who testified that selections like colors, trim, and tile are not covered by the 14-day deadline and simply need to be done by the preconstruction meeting.  *See* Trial Tr. 163–64.  McCann was the corporate officer who signed the Agreement for Ashburn.

[33] PX 43.

[34] *Id.* at P-461.

[35] *See* Trial Tr. 80–81.

[36] *Id*. 38–39.

[37] *See id.*

selections.[38] Stombaugh—who had never before received notice of L&L's participation in the options-selection process—said she had not.[39] This prompted Rush to contact McCann to ask her if L&L had ever contacted Stombaugh.[40] McCann responded that L&L had not, and stated:

> That was my fault. I didn't send [Stombaugh's] information to L&L. I just sent it to them. Give them a couple of days to get this into the system and they'll reach out to [Stombaugh].[41]

McCann sent Stombaugh's information to L&L by email and wrote: "I forgot to send this to your office. Can we get these buyer's [*sic*] scheduled ASAP to make selections. Please see L&L contact sheet, house plans, colored flooring sheet, etc."[42] L&L promptly contacted Stombaugh and scheduled an options-selection meeting with her for August 21, 2021.[43]

### 1. The Tiling Selection

At the options-selection meeting, Larry Mocadlo ("Mocadlo") of L&L informed Stombaugh that the meeting was the time for Stombaugh to make upgrades to any selections for the Property.[44] Mocadlo and Stombaugh

---

[38] *Id.* 39.

[39] *Id.*

[40] *See id.*

[41] PX 26.

[42] *Id.*

[43] Trial Tr. 40.

[44] *Id.* 41.

discussed Stombaugh's tile selections. Mocadlo was unaware that Stombaugh had already selected the Calcutta tiling for her master shower because Ashburn did not include it in the paperwork that it sent to L&L.[45] He informed Stombaugh that the Calcutta tiling she chose in January would require an additional upgrade not reflected in the Agreement's price.[46] But Mocadlo could not give Stombaugh a specific upgrade price at that time. He told Stombaugh the upgrade price would need to be resolved before they could execute a formal option selection agreement.[47] He also told Stombaugh they would proceed with selecting the rest of her options.[48]

Between August and November 2021, Stombaugh wrote to Mocadlo numerous times to request an update on the tiling upgrade price. Mocadlo's responses were minimal and vague. Stombaugh did not receive a specific estimate for the increased tile price until September, when Mocadlo informed her that the tiling upgrade would cost "almost $2000."[49] After this, however, Mocadlo again became unresponsive.

---

[45] *Id.* 41–42.

[46] *Id.*

[47] *Id.* 42.

[48] *Id.*

[49] PX 39 at P-451.

On November 15, Mocadlo told Stombaugh that her desired tiling would require another escalation—this time, "an additional $416.00."[50] Mocadlo added that, if Stombaugh desired floor-to-ceiling tiling, it "would cost an additional $395.00."[51] On November 20, L&L sent to Stombaugh a formal selection agreement for the tiling.[52] Stombaugh signed the agreement on the same day.[53]

### 2. The Property Price Escalation

Separately, on October 22, McCann told Rush of a price escalation Ashburn sought to impose on the purchase of the Property. McCann acknowledged that Ashburn "started construction on this home without . . . providing the escalation charge to be added to the contract."[54] She acknowledged that Ashburn "should not have started this home without . . . providing this information prior to the breaking of ground."[55] But she explained to Rush that Ashburn needed to impose a $42,363 price escalation on

---

[50] *Id.* at P-450.

[51] *Id.* at P-451.

[52] *See* PX 14. The agreement is dated "August 21, 2021." *Id.*

[53] *Id.*

[54] PX 32 at P-431.

[55] *Id.*

- 10 -

the sale.[56] At trial, McCann testified, under questioning from defendants' counsel, "I'm sure I discussed it with [Mr. Ashburn], and I sent it."[57]

Ferguson informed Stombaugh of the requested price escalation.[58] Because Ashburn had already broken ground on the Property, Stombaugh was understandably confused about the escalation and asked to contact Ashburn directly to discuss it.[59] Stombaugh contacted McCann by phone and email on October 22, October 25, and October 26, but received no response each time.[60] Ferguson later informed Stombaugh that Ashburn was refusing to proceed with the Agreement until the parties resolved the attempted price escalation.[61]

At trial, Mr. Ashburn conceded the Price Escalation Addendum unambiguously prohibited Ashburn from increasing costs after it broke ground on the Property.[62] He suggested sending this was a mistake, and that once Ashburn understood "after the fact" the price escalation was unenforceable, he

---

[56] *Id.*

[57] Trial Tr. 252. Mr. Ashburn, for his part, said he did not recall the conversation but McCann would have no reason to lie about it. *Id.* 340.

[58] PX 33 at P-434.

[59] *Id.* at P-435.

[60] PX 34. Mr. Ashburn maintained at trial that the reason Ashburn ignored Stombaugh's communications was because she had copied her counsel on emails so Ashburn would, in turn, only communicate with Stombaugh through its own counsel. *See, e.g.*, Trial Tr. 347.

[61] *See* Trial Tr. 74.

[62] *See id.* 307, 338–39.

instructed counsel (defendants' trial counsel here) to retract it.[63] Defendants did not offer any contemporaneous evidence to support this bare assertion and did not address it during posttrial briefing or at posttrial argument.[64]

On October 29, defendants' counsel wrote to Stombaugh's counsel. Defendants' counsel asserted that Stombaugh defaulted on the Agreement by purportedly failing to timely make options selections.[65] Defendants' counsel insisted Ashburn had the right to terminate the Agreement and that Stombaugh's purported failure entitled defendants to retain her deposit.[66] Defendants' counsel told Stombaugh she could receive her deposit back if she agreed to terminate the Agreement.[67] Counsel for Stombaugh and Defendants traded correspondence on this issue into November.[68]

In January 2022, still anticipating her purchase of the Property would close, Stombaugh obtained a new mortgage commitment, at a rate of 3.625%.[69] Despite this, the parties' dispute over the price escalation and Stombaugh's

---

[63] *See id.*

[64] The court does not find this testimony to be credible. There was nothing accidental about what Ashburn did. McCann testified the price escalation notice was sent intentionally, knowing they had already broken ground, after she talked to Mr. Ashburn about it. *Id.* 252.

[65] PX 16 at P-359.

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] Trial Tr. 365.

purported default led to the transaction stalling and construction on the Property stopping.  Stombaugh testified that, because of this, the Property stayed "open to the elements" after November 2021, until the Property's eventual completion in late 2024.[70]  The parties never conducted the pre-drywall inspection of the Property and Stombaugh has yet to attend a final walkthrough.[71]

## D.    Recent Developments

Still in need of a home, in 2023, Stombaugh purchased a different property in Magnolia.[72]  Stombaugh executed a mortgage for the home with Capital Bank Home Loans ("Capital Bank"), through its agent, Mr. Joe Gensoli.[73]  She still wants to purchase the Property but now as an investment property—one that she can "rent . . . out and hopefully be able to have . . . as a passive income."[74]  Stombaugh testified that she could pay a down payment for the Property of up to $85,000.[75]

Stombaugh's previous commitments for the Property have expired.  In 2024, Capital Bank issued Stombaugh a mortgage preapproval letter for the

---

[70] *Id.* 70.

[71] *See id.* 73.

[72] *Id.* 71.

[73] *See id.* 97–98.

[74] *Id.* 71.

[75] *See id.* 72.

Property.[76]  The loan amount requires a 10% down payment and its principal bears an interest rate of 6.375%.[77]

Capital Bank issued the 2024 preapproval letter to Stombaugh while it was still unclear whether she would use the Property as her primary residence.[78] Since then, however, Stombaugh has chosen to use the Property for investment purposes.  Accordingly, Capital Bank issued Stombaugh updated mortgage terms reflecting the Property's investment purpose.  The updated terms require a 20% down payment and would carry an interest rate of 7.5%.[79]  Gensoli testified Capital Bank can issue the new mortgage within 21 days of this action's resolution.[80]

## II.    PROCEDURAL POSTURE

On January 24, 2022, Stombaugh filed the original complaint.[81]  On February 11, Stombaugh filed a notice of *lis pendens* in the Kent County Recorder of Deeds office.[82]  On February 16, Stombaugh filed the amended

---

[76] PX 44.  Gensoli reviewed and prepared the letter but had his processor, Lisa Deal, sign the letter.  Trial Tr. 102.  Gensoli maintains this is Capital Bank's standard practice. *Id.*

[77] PX 44 at P-465.

[78] *See* Trial Tr. 107–08.

[79] *See id.* 112.

[80] *See id.* 115.

[81] Dkt. 1.

[82] Notice of Filing of *Lis Pendens* Pursuant to 25 *Del. C.* § 1605, Dkt. 5.

complaint.[83]   The amended complaint asserts defendants' breach of the Agreement and seeks specific performance of the Agreement.[84]   Stombaugh also seeks damages stemming from interest differential between her past and present mortgages.[85]

On July 7, defendants filed their amended answer and counterclaim.[86] Defendants' counterclaim asks the court to declare (1) Stombaugh "failed to make option selections within the required time" and (2) this purported failure "allows, at Defendant Ashburn's election, to declare the Sales Agreement void, and in addition, allows forfeiture of Plaintiff's deposits."[87]

On May 29, 2024, defendants filed the "Motion for Mandatory Cancellation of *Lis Pendens* Pursuant to 25 *Del. C.* § 1606, or in the alternative, for Settlement within Thirty (30) Days of 16 Douglas Drive, Frederica, Delaware 19946."[88]   As the name suggests, the motion generally requested either cancellation of the *lis pendens* on the Property or "an order requiring closing on the Property within thirty (30) days of the date of the Order[.]"[89]

---

[83] Verified Am. Compl. ("Am. Compl."), Dkt. 4.

[84] *Id.* ¶ 1.

[85] *See id.*, Req. for Relief ¶ 2.

[86] Dkt. 8.

[87] *Id.* at 23–24.

[88] Dkt. 25.

[89] *Id.*, Req. for Relief ¶¶ A–B.

The parties briefed the motion and the court heard oral argument on July 18.[90]

On July 19, the court denied the motion.[91] As for defendants' requested order

for prompt settlement, the court explained such a request "essentially asks the

[c]ourt to force a piecemeal resolution without [Stombaugh]'s buy-in."[92]

On January 9, 2025, the court held the first day of trial on the parties'

claims.[93] On March 18, the court held a second day of trial to allow parties to

finish examining their witnesses.[94] The parties filed posttrial briefs through

September.[95] On February 26, 2026, the court heard oral argument and took the

matter under advisement.[96]

## III. ANALYSIS

Stombaugh asserts a claim of breach of contract against defendants. She

seeks (1) an order of specific performance requiring defendants to comply with

the Agreement; (2) specific damages reflecting the interest differential between

her past and present mortgages; and (3) an award of attorney fees.[97]

Defendants, in turn, seek a declaration that Stombaugh failed to timely select

---

[90] *See* Dkt. 33.

[91] Dkt. 34.

[92] *Id.*

[93] Dkt. 63.

[94] *Id.*

[95] Dkts. 71–74.

[96] Dkt. 79.

[97] Pl.'s Opening Br. 58.

options and, as such, defendants can terminate the Agreement.[98]  I begin with defendants' counterclaim.

## A.    The Counterclaim

Defendants argue that Stombaugh breached the Agreement by failing to timely select her options through L&L.[99]  Defendants point to the "time is of the essence" language in paragraph 7 of the Agreement, note that Delaware courts routinely enforce such language, and say it is fatal to Stombaugh's claims here because she did not select her tile within 14 days.[100]  Near the end of trial, defendants unveiled a new argument for why Stombaugh allegedly breached the Agreement's "time is of the essence" clause:  Stombaugh failed to maintain a valid mortgage commitment throughout the pendency of the parties' dispute over the Property.[101]  Both arguments fail.

### 1.    The Purported 14-Day Options Deadline

Defendants' argument that Stombaugh breached the Agreement's "time is of the essence" clause by not selecting her tile within 14 days fails for at least three reasons.

---

[98] *See* Posttrial Opening Br./Answering Br. of Defs./Countercl. Pls. ("Defs.' Opening Br."), Dkt. 72 at 15.

[99] *See id.* 33.

[100] *See* Posttrial Reply Br. of Defs./Countercl. Pls. ("Defs.' Reply Br."), Dkt. 74 at 11, 27–33.

[101] Trial Tr. 315–17; *see also* Defs.' Opening Br. 15, 18–20.

First, the argument fails because the 14-day options deadline did not apply to Stombaugh's tile selection, as McCann, the Ashburn officer who signed the Agreement, testified.[102]  Items like color, trim, and tile did not need to be done until the preconstruction meeting.[103]

Second, even if Stombaugh needed to select tile within 14 days of signing the Agreement, she did.  In fact, she selected tile *before* the Agreement was signed.[104]  The Agreement says only that options (however defined) must be selected within 14 days; it does *not* say that any options, once selected, may never be changed.[105]  Defendants drafted the Agreement and the addendums,[106] so ambiguities and gaps in their language must be construed against defendants:

> "If the contractual language at issue is ambiguous and if [one party] did not negotiate for the agreement's terms, [Delaware courts] apply the *contra proferentem* principle and construe the ambiguous terms against the drafter." If "the articulation of contract terms . . . appears to have been entirely within the control of one party . . . that party bears full responsibility for the effect of those terms."  This is because "[a]s the entity in control of

---

[102] Trial Tr. 163–64.

[103] *Id.*

[104] PX 21 at P-388 to P-389.  Defendants now concede Stombaugh made her initial tile selection by the time the parties signed the Agreement.  *See* Defs.' Opening Br. 7 ("Petitioner made her initial option[s] selections as to the bathroom at issue on March 3, 2021.").

[105] *See* Selection Time Limit Addendum at P-342.  Structural changes, on the other hand, "will not be made after plans have been submitted for [the] construction permit[.]"  *Id.*

[106] *See* Trial Tr. 91–92, 252–53.

the process of articulating the terms of the [agreements], it [is] incumbent on the [drafter] to make their terms clear."

*Leo Invs. H.K. Ltd. v. Tomales Bay Cap. Anduril III, L.P.*, 342 A.3d 1166, 1209 (Del. Ch. 2025) (first quoting *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013); then quoting *SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 43 (Del. 1998); and then quoting *Juul Labs, Inc. v. Grove*, 238 A.3d 904, 911 (Del. Ch. 2020)).

Third, there is a heavy amount of inequity in defendants' position that further counsels against accepting their self-serving interpretation of the Agreement and the addendums. Defendants concede Stombaugh made "initial options selections" on March 3, 2021,[107] but then insist that the only way Stombaugh could comply with the 14-day options deadline was by working with L&L.[108] This is dirty pool. The Agreement and the addendums do not mention L&L.[109] Defendants and their agents said nothing about L&L when the parties signed the Agreement,[110] and they did not even remember to connect Stombaugh and L&L until months later.[111] There was no way for Stombaugh to know on March 3, 2021 that defendants believed she had 14 days to meet

---

[107] Defs.' Opening Br. 7.

[108] *Id.* 15–16.

[109] *See generally* PX 11.

[110] *See* Trial Tr. 91–92.

[111] *See id.* 39–40, 91–93, 167–74.

- 19 -

with L&L, because the only parties that knew L&L had a role to play—defendants and their agents—stayed silent.[112] Defendants having withheld the information from Stombaugh, it would be inequitable to allow them to profit from that withholding.

Fourth, and finally, even if March 17, 2021 was Stombaugh's deadline and even if she failed to meet it, defendants still lose. "Time is of the essence" clauses simply do not work the way defendants contend. They have approached this case as if violation of such a clause turns the contract into an open-ended option for the non-breaching party, who can continue to perform under the contract as long as it suits them, then declare the contract void and walk away as soon as it does not. But that is wrong. "[T]ime [is] of the essence may be waived by inconsistent conduct subsequent to the time fixed for performance." *Goldstein v. Buiano*, 1962 WL 69603, at *1 (Del. Ch. Oct. 31, 1962). "After a contractual time limit has lapsed, a party may not, for months, act as if the contract remains in effect and then suddenly treat the time limit as critical and the contract as void when performance under the contract is not rendered as that party had hoped." *Keyser v. Curtis*, 2012 WL 3115453, at *10 (Del. Ch. July 31, 2012). That is precisely what defendants did here. They

---

[112] This assumes defendants actually held this view before they needed a defense to Stombaugh's breach of contract claim. McCann's trial testimony suggests otherwise. *See id.* 163–64.

have waived the "time is of the essence" clause even if Stombaugh triggered it by failing to make options selections with L&L by March 17, 2021.[113]

In short, defendants cannot credibly maintain Stombaugh defaulted by failing to select her options and upgrades through L&L. Stombaugh first selected her tiling in January 2021 and Ferguson confirmed he would include her selections in the Agreement.[114] Stombaugh then confirmed those selections with L&L in August, after Ashburn finally connected Stombaugh and L&L.[115] This is all that could reasonably be required of Stombaugh under circumstances where defendants knew they held the cards and did not show their hand.

### 2. Defendants' Untimely Mortgage Commitment Argument

As noted, on the second day of trial, months after discovery closed[116] and the court granted the parties' pretrial order,[117] defendants unveiled a new

---

[113] Defendant's reliance on the Agreement's non-waiver clause does not help them here. *See* Agreement ¶ 24 ("The start of any activity by us in connection with the Property is not to be deemed a waiver of any of our rights under this Agreement[.]"); Defs.' Opening Br. 24–25, 32–33; Defs.' Reply Br. 15–16. "[T]he law is clear that non-waiver clauses are not iron-clad protections that preclude courts from holding [a party] responsible for their post-contracting behavior." *In re Coinmint, LLC*, 261 A.3d 867, 899 (Del. Ch. 2021) (quoting *Viking Pump, Inc. v. Liberty Mut. Ins. Co.*, 2007 WL 1207107, at *28 n.116 (Del. Ch. Apr. 2, 2007)); *see also Rehoboth Mall L.P. v. NPC Int'l, Inc.*, 953 A.2d 702, 703 (Del. 2008) ("The landlord argues that the lease's 'no waiver' provision allows the landlord to enforce the tenant's past defaults at any time. We disagree. The no waiver provision allows the landlord to strictly enforce future defaults notwithstanding its acquiescence in past defaults.").

[114] *See* PX 21 at P-389.

[115] *See* Trial Tr. 39–42.

[116] *See* Dkt. 45 ¶ 1(c).

- 21 -

argument for why Stombaugh allegedly breached the Agreement's "time is of the essence" clause: Stombaugh failed to maintain a valid mortgage commitment throughout the pendency of the parties' dispute over the Property.[118]

I will not dwell long on this argument. Defendants raise the issue far too late for me to consider it. They should have raised it in their counterclaim, but did not.[119] They should have raised it during discovery, but did not.[120] They should have identified it in the pretrial order as an issue that remained to be litigated, but did not.[121] They could have questioned Stombaugh about it at

---

[117] Dkt. 59.

[118] Trial Tr. 315–17; *see also* Defs.' Opening Br. 15, 18–20.

[119] *See* Dkt. 8, Countercl. ¶¶ 1–4 (identifying as the basis for the counterclaim only "Plaintiff['s] fail[ure] to make option selections within the required time").

[120] Defendants did not raise the mortgage commitment letter in their responses to Stombaugh's interrogatories. *See* PX 7; *see also Marshall Fam. Props., LLC v. Fusco*, 2026 WL 221459, at *4 (Del. Ch. Jan. 28, 2026) ("The Supreme Court 'has long recognized the purpose of discovery is to advance issue formulation, to assist in fact revelation and to reduce the element of surprise at trial.'") (quoting *Levy v. Stern*, 1996 WL 742818, at *2 (Del. Dec. 20, 1996) (ORDER)).

[121] Defendants did not identify the validity of Stombaugh's mortgage commitment as an issue to be tried in the pretrial order. *See* Dkt. 59 at 8–10; *see also Zhou v. Deng*, 2022 WL 1024809, at *2 (Del. Ch. Apr. 6, 2022) (finding waiver when parties failed to raise arguments in their pleadings or in the pretrial order and stating "[b]y that time, the opposing party has already shaped his trial plans, and it is simply too late and unfair to expect him meaningfully to confront the arguments so close to (or after) trial.") (citations omitted); *ABC Woodlands, L.L.C. v. Schreppler*, 2012 WL 3711085, at *3 (Del. Ch. Aug. 15, 2012) (finding party waived an argument by not raising it in the pretrial order); *New Start Hldgs., LLC v. Zhou*, 2024 WL 4039440, at *16 n.250 (Del. Ch. Sept. 4, 2024) ("[T]he pretrial order is meant to be an 'efficacious' and 'salutary' aid for the Court 'toward sifting the issues in order that the suit will go to trial only on questions involving honest disputes of fact or law.'") (citations omitted).

trial, but did not.[122]  Defendants waived this argument.[123]  The court will not consider it now.[124]

*          *          *

For all of these reasons, I recommend judgment in favor of Stombaugh on defendants' counterclaim.

## B.    Breach of Contract

"To prove a breach of contract, the plaintiffs must demonstrate (1) the existence of a contract, (2) the breach of an obligation imposed by the contract, and (3) resulting damages." *O'Connor v. Beachy Keen Servs., LLC*, 2025 WL 801165, at *2 (Del. Ch. Mar. 13, 2025) (citing *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009)).  Stombaugh has met each element.

### 1.    The Existence of a Contract

It is undisputed that the Agreement is a valid contract.  In exchange for consideration of $350,411, Ashburn agreed to transfer to Stombaugh the deed

---

[122] *See* Trial Tr. 74–82, 370.

[123] The Agreement's non-waiver clause does not help defendants here either.  *See supra* note 113.

[124] Not only did defendants engage in improper trial-by-ambush, their multi-year, unreasonable, and prejudicial delay in raising Stombaugh's mortgage commitment as a defense means they are also guilty of laches. *See Whittington v. Dragon Gp., LLC*, 991 A.2d 1, 7 (Del. 2009) ("Laches is an unreasonable delay by a party, without any specific reference to duration, in the enforcement of a right, and resulting in prejudice to the adverse party.").  The court notes, also, that Stombaugh was told by Ferguson, the Rush Realty agent who served as the official go-between for Stombaugh and defendants, that her March 2021 mortgage commitment letter would remain valid throughout construction, and defendants never asked Stombaugh for an updated mortgage commitment.  Trial Tr. 80–81, 366–67.

- 23 -

to the constructed Property.[125]   The Agreement obligated Ashburn to substantially complete the Property's construction,  "in any case, on or before two (2) years from the Agreement of Sale Date."[126]   Once substantial completion occurred, Ashburn must select and notify Stombaugh of the "date, time, and place for Settlement."[127]

Moreover, through the Selections Time Limit Addendum, Ashburn agreed to schedule a pre-drywall meeting for Stombaugh to attend.[128]   And through the Price Escalation Addendum, Ashburn agreed not to escalate the purchase price after ground broke on the Property.[129]

### 2.    The Breach

Stombaugh argues defendants breached the Agreement by refusing to engage with her after Ashburn's improper price escalation.[130]   Stombaugh maintains defendants' failure to schedule a pre-drywall meeting before drywall installation is further evidence of defendants' breach.[131]   I conclude Ashburn

---

[125] *See* Agreement 2 ("SETTLEMENT").

[126] *Id.* ¶ 13.

[127] *Id.* ¶ 12.

[128] *Id.* at 11.

[129] PX 12.

[130] *See* Am. Compl. ¶ 71.

[131] *See* Pl.'s Opening Br. 36.

breached the Agreement. Sobrook cannot have breached the Agreement because it was not part of it.[132]

### a. Ashburn Repudiated the Agreement

"A repudiation of a contract is an outright refusal by a party to perform a contract or its conditions." *W. Willow Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2009 WL 458779, at *5 (Del. Ch. Feb. 23, 2009) (quoting *PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1014 (Del. Ch. 2004)). "A party may repudiate an obligation through statements when its language, reasonably interpreted, indicates that it will not or cannot perform[.]" *Id.* (citations omitted). "An attempt to renegotiate terms will not constitute repudiation absent an unqualified refusal to perform unless the non-repudiating party accedes." *Id.* (citing *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *12 (Del. Ch. May 2, 2007)) (emphasis added).

The Price Escalation Addendum imposed on Ashburn the plain obligation to not add "additional escalation charges . . . once [Ashburn] ha[s] broken ground on the start of construction."[133] The record is clear Ashburn

---

[132] *See, e.g.*, *Wallace ex rel. Cencom Cable Income P'rs II, L.P. v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999) ("It is a general principle of contract law that only a party to a contract may be sued for breach of that contract.") (citing *Crabtree v. Tristar Auto. Gp., Inc.*, 776 F. Supp. 155, 166 (S.D.N.Y. 1991)); *see also* Agreement 9 (signatures). Even though Sobrook is not a named party to the Agreement, Mr. Ashburn testified that specific performance of the Agreement would result in Sobrook directly transferring the Property to Stombaugh. *See* Trial Tr. 337.

[133] PX 12.

knew of this obligation but nevertheless attempted to impose a price escalation after it broke ground on the Property, and thus breached the Agreement.[134] Nor is there any tangible, credible evidence Ashburn ever retracted the escalation, just Mr. Ashburn's self-serving trial testimony.[135] Ashburn repudiated the Agreement when, after its wrongful escalation, it (1) refused to engage with Stombaugh, (2) wrongfully declared her in default, and (3) threatened to retain her deposit if she chose not to terminate the Agreement herself.[136]

### b. Ashburn's Other Breaches

The Selections Time Limit Addendum imposed on Ashburn the plain obligation to schedule a pre-drywall meeting with Stombaugh.[137] Ashburn never did this.[138] If, as Mr. Ashburn insists, Ashburn has always been ready to perform the Agreement,[139] it failed to be here.

Ashburn also failed to settle the Property with Stombaugh within the time the Agreement required. Although it appears conceded that, by 2024,

---

[134] *See* Trial Tr. 338–39.

[135] *See id.* 307, 339.

[136] *See* PX 16 at P-360 ("Please let me know Ms. Stombaugh's decision within five business days. Should there be no response within this time period, Ashburn will elect its contractual right to terminate the Sales Agreement and retain Ms. Stombaugh's deposit(s)."); *see also* Trial Tr. 74.

[137] Agreement 11.

[138] *See* Trial Tr. 73.

[139] *See id.* 310.

construction of the Property's exterior was complete,[140] it may not be the case that the Property was substantially completed under the Agreement because, again, Ashburn failed to notify Stombaugh of an impending settlement of the Property.[141]

In more ways than one, Ashburn breached its obligations under the Agreement. The second element of Stombaugh's breach claim is therefore established.

### c. Defendants Fail to Defend the Breaches

Defendants defend their breach in two ways. As previously addressed, defendants argued Stombaugh's own breach entitled them to terminate the Agreement. I have rejected that claim. Defendants' other argument is that, under paragraph 25 of the Agreement, Ashburn was not bound by Ferguson's statement that Ashburn was delaying performance until the price escalation issue resolved.[142]

Paragraph 25 of the Agreement states, in full:

---

[140] *See id.* 70.

[141] *See* Agreement 2 ("SUBSTANTIAL COMPLETION: When an occupancy permit is issued by the local building authority; or when the Home is otherwise habitable."), ¶ 12 ("Settlement will take place upon Substantial Completion at a date, time, and place *that we select*. * * * We will give you at least ten (10) days prior notice of the date, time and place for Settlement.") (emphasis added).

[142] *See* Trial Tr. 75–76; Defs.' Opening Br. 27 ("Emails in evidence are devoid of any communication indicating apparent agency that would lead [Stombaugh] to believe Ferguson had authority to make decisions in violation of paragraph 25.").

(25) <u>No Other Agreements:</u>  Except as provided in your Ashburn Home Warranty Program, and except for applicable statutory warranties, we make no other representations or warranties of any kind, express or implied, with regard to the Property, and no other representation or warranty of any kind, express or implied, forms a basis of the bargain between you and us.  If requested, you agree to sign at settlement under this Agreement of Sale a written instrument confirming your consent to exclude and modify the express warranties relating to the Property.  We make no oral or written agreements or representations, directly or indirectly, connected with this Agreement of Sale except as set forth in this Agreement of Sale.  We make no oral or written agreements or representations, directly or indirectly, connected with this Agreement of Sale except as set forth in this Agreement of Sale.  We make no representation concerning any land adjacent to or near the Property.  We will not be bound by any representations or promises made by any salesperson or other person unless they are included in this Agreement of Sale. By including the following terms, we are making them a part of this Agreement of Sale[.][143]

Defendants argue that this language shields them from a finding that Ashburn wrongly imposed a price escalation because Ferguson, a Rush Home Realty employee, conveyed the escalation request to Stombaugh.[144]  The argument fails because paragraph 25 concerns representations that "form[] a basis of the bargain," *i.e.*, representations regarding the terms of the Agreement that induced Stombaugh to execute it.  Paragraph 25 does not extend to post-

---

[143] Agreement ¶ 25.

[144] Defs.' Opening Br. 27.

- 28 -

execution representations made during the course of performance at the principal's (*i.e.*, Ashburn's) direction.[145]

Ashburn breached its obligations under the Agreement. Defendants failed to sufficiently defend Ashburn's breach.

## 2. The Resulting Damage

Ashburn's breach of the Agreement damaged Stombaugh. Fundamentally, Stombaugh has "been deprived of the home [she] chose and contracted to purchase." *O'Connor*, 2025 WL 801165, at *3. Even if the court orders specific performance of the Agreement, Stombaugh will be financing the transaction with a higher interest rate than she initially secured for the home. This, too, constitutes damage. *See Stephenson v. Capano Dev. Co.*, 462 A.2d 1069, 1077 (Del. 1983). Accordingly, Stombaugh established the third element of her breach of contract claim. She prevails on her claim against Ashburn.

## B. Specific Performance

Stombaugh seeks specific performance of the Agreement. As explained by the Supreme Court of Delaware in *Osborn ex rel. Osborn v. Kemp*:

---

[145] *See Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 140 (Del. Ch. 2009) ("The purpose of an anti-reliance provision is to make clear what information the contracting party did and did not rely upon *when entering into the transaction*.") (emphasis added); *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1059 (Del. Ch. 2006) ("The integration clause must contain 'language that . . . can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract.") (quoting *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004), *aff'd*, 867 A.2d 902 (Del. 2005)).

> A party must prove by clear and convincing evidence that he or she is entitled to specific performance and that he or she has no adequate legal remedy. A party seeking specific performance must establish that (1) a valid contract exists, (2) [s]he is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance.

991 A.2d 1153, 1158 (Del. 2010) (citations omitted). As an initial matter, Stombaugh has sufficiently established that she lacks an adequate remedy at law. "The Agreement—a contract for the sale of real property—'is the quintessential contract for which specific performance is available.'" *O'Connor*, 2025 WL 801165, at *3. Indeed, "specific performance of a real estate sale contract is often the only adequate remedy for a breach by the seller, except in rare circumstances." *Szambelak v. Tsipouras*, 2007 WL 4179315, at *7 (Del. Ch. Nov. 19, 2007).

Moving to the elements, the court has already determined a valid contract, the Agreement, exists between Stombaugh and Ashburn. I discuss the remaining two elements below.

### 1. Ready, Willing, and Able

Stombaugh has shown by clear and convincing evidence she is ready, willing, and able to perform. First, she has complied in all respects with her end of the Agreement. Second, she has received a new, conditional loan

- 30 -

commitment for the Property.[146]  Third, she has enough liquid cash to make a down payment on the Property.[147]

Defendants argue that Stombaugh needs more than this to show she is ready, willing, and able to perform the Agreement.[148]  Citing the Supreme Court's opinion in *Osborn ex rel. Osborn v. Kemp*, defendants argue that "[a] buyer who is dependent on uncommitted financing or who cannot demonstrate access to the full purchase funds is not 'able to perform.'"[149]  This argument misstates the holding in *Osborn* and thus fails.

In *Osborn*, the Supreme Court upheld the determination that a buyer was ready, willing, and able to perform even though "he did not have the necessary financing at the time of trial" in the Court of Chancery.  991 A.2d 1153, 1161 (Del. 2010).  The Supreme Court explained that Delaware courts "permit the parties a reasonable time to obtain financing and conclude the transaction" unless doing so would be inconsistent with a "time is of the essence" clause in the contract.  *Id.* (citing WILLISTON ON CONTRACTS § 67:15 (4th ed. 2009)).  Quoting *Williston on Contracts*, the court explained "[a] purchaser will be deemed ready and able to perform . . . where the agreement is subject to financing, and the purchaser is able to obtain it."  *Id.* at 1161 n.26.

---

[146] *See* Trial Tr. 112–15.

[147] *See id.* 72.

[148] *See* Defs.' Answering Br. 12.

[149] Defs.' Reply Br. 23.

Here, the Agreement contains a "time is of the essence" clause that required Stombaugh to obtain and deliver to Ashburn a mortgage commitment within 30 days of the Agreement's execution.[150] She did.[151] So the Agreement's "time is of the essence" clause was satisfied. Giving Stombaugh a reasonable amount of time now to obtain financing and conclude the transaction is consistent with the Supreme Court's ruling in *Osborn* and an appropriate remedy for Ashburn's breach of the Agreement. Capital Bank has indicated that Stombaugh will be able to receive her loan within 21 days of this action's resolution.[152] Stombaugh has thus put herself in a position to procure financing for the Property in a timely manner under the Agreement. She is ready, willing, and able to perform.

## 2. The Balance of Equities

Balancing the equities requires the court to "consider whether 'specific performance of a validly formed contract would cause even greater harm than it would prevent.'" *White v. Russell*, 2023 WL 3191746, at *7 (Del. Ch. May 2, 2023) (quoting *Hastings Funeral Home, Inc. v. Hastings*, 2022 WL 16921785, at *8 (Del. Ch. Nov. 14, 2022)). Here, the balance of equities tilts decisively in Stombaugh's favor.

---

[150] Agreement ¶ 7(1)(b).

[151] *See* PX 43.

[152] Trial Tr. 115.

The parties executed a contract. Stombaugh performed her obligations under it. Ashburn chose to escalate the purchase price despite knowing it was prohibited from doing so.[153] When Stombaugh took issue with this, Ashburn tried to bully her into dropping the issue by falsely accusing her of breaching the Agreement.[154] And when that failed, Ashburn simply stopped dealing with Stombaugh.[155]

Defendants did not show that they would be harmed from specific performance of the Agreement.[156] They argue the equities balance in their favor because Stombaugh "defaulted on crucial terms of the contract; meanwhile, Defendants, despite being ready to perform, have been left holding an empty property for years in a rising market[.]"[157] As explained, Stombaugh did not breach the Agreement by failing to timely select her options. And to the extent defendants argue that the Property's appreciated value tips the equities in their favor, they are incorrect as a matter of law.[158]

---

[153] *See, e.g.*, PX 32 at P-431.

[154] *See* PX 16 at P-359 to P-360.

[155] *See* Trial Tr. 52.

[156] *See Osborn*, 991 A.2d at 1161 ("When balancing the equities, we must be convinced that specific enforcement of a validly formed contract would not cause even greater harm than it would prevent.") (citation modified).

[157] Defs.' Reply Br. 24.

[158] *See, e.g.*, *Osborn*, 991 A.2d at 1162 ("We do not discount that beach front property has appreciated over the span of twenty years, however, the 'mere increase in land values, unaccompanied by other circumstances showing inequity, is not such hardship

In short, the balance of equities tilts decisively toward Stombaugh. The third element of specific performance is established. The court thus grants Stombaugh's request for specific performance of the Agreement.

## C. The Requested Damages

In addition to specific performance, Stombaugh seeks damages stemming from the interest rate differential between the interest rate she had obtained in 2021 versus the interest rate she would have to pay today to finance the Property's purchase.[159]

"This court may 'award damages or pecuniary compensation along with specific performance when the decree as awarded does not give complete and full relief.'" *O'Connor*, 2025 WL 801165, at \*4 (quoting *Tri State Mall Assocs. v. A.A.R. Realty Corp.*, 298 A.2d 368, 371 (Del. Ch. 1972)). "In the context of real estate transactions, interest rate differentials have been awarded as damages for breach of contract and as ancillary relief in actions for specific performance." *Stephenson*, 462 A.2d at 1077 (collecting cases). This is because, often, "[t]he increased financing cost is a predictable consequence of the vendor's delay in completing the transaction." *Id.* (collecting cases).

That said, Stombaugh's request for damages is only ancillary to her primary request for specific performance. *See id.* "[I]n decreeing specific

---

as justifies a court of equity in denying specific performance.") (quoting *Cunningham v. Esso Standard Oil Co.*, 118 A.2d 611, 614 (Del. 1955)).

[159] *See, e.g.*, Pl.'s Opening Br. 58.

performance [this court] will adjust the equities of the parties in such a manner as to put them as nearly as possible in the same position as if the contract had been performed *according to its terms*." *Tri State Mall Assoc. v. A.A.R. Realty Corp.*, 298 A.2d 368, 371-72 (Del. Ch. 1972) (emphasis in original).  In doing so, "the [c]ourt must consider the gains enjoyed by the parties over the [period of breach] by reason of their failure to exchange the consideration required under the contract."  *Vaughan v. Creekside Homes, Inc.*, 1994 WL 586833, at *2 (Del. Ch. Oct. 7, 1994).

Absent Ashburn's breach of the Agreement, Stombaugh would have purchased the Property in late 2021 or early 2022 with a 30-year mortgage at an interest rate of 3.625%.[160]  Now, the interest rate available to her to obtain a mortgage on the Property is much higher.[161]  This is, in the *Stephenson* court's words, a "predictable consequence" of the breach, so some measure of relief would ordinarily be equitable and appropriate.

But that is not the end of the inquiry.  As the court explained in *Tri State*, equity's role is to put *the parties*, not just Stombaugh, in the positions they would have been in had the transaction been performed in late 2021 or early 2022.  *See Tri State*, 1994 WL 586833, at *2.  Had Ashburn conveyed the Property in late 2021 or early 2022, Stombaugh would have paid Ashburn

---

[160] Trial Tr. 364–66.

[161] *Id*. 112.

$350,411 and Ashburn would have been able to use those funds for the ordinary sort of things that a builder will do with the proceeds—such as paying subcontractors and suppliers, and reinvesting or distributing net profits.[162]

In the *Vaughan* court's words, it appears defendants here enjoyed no "gains" by reason of the failure to convey the Property in late 2021 or early 2022. Defendants have received no rent or profits from the Property, and they have, presumably, been incurring the normal expenses associated with ownership, such as maintenance, taxes, and insurance, that Stombaugh would have paid upon acquiring ownership. Stombaugh, for her part, gained from being able to use the unpaid purchase price to purchase her primary residence, and she will gain from being able to acquire the Property at a substantial discount to its current appraised value.[163] *See Vaughan*, 1994 WL 586833, at *2–3.[164]

---

[162] *See Hastings Funeral Home, Inc. v. Hastings*, 2022 WL 16921785, at *9 (Del. Ch. Nov. 14, 2022) ("In addition, if delivery had occurred, Hastings would have received the sale proceeds from HFH on January 25, 2021, and he is entitled to a credit for interest on the unpaid purchase money since January 25, 2021 . . . . [P]re-judgment interest at the legal rate on the $850,000.00 sale price should be added for the same period.").

[163] Defendants presented credible and unopposed evidence that as of November 2024 the Property was worth $95,589 more than when the parties first executed the Agreement. *See* Trial Tr. 224; *see also* DX 6 (November 17, 2024 Appraisal Report).

[164] In *Vaughan*, the court identified "three distinct 'returns'" from the parties' failure to close the transaction and convey the property in exchange for payment of the purchase price: (1) seller's receipt of rental income; (2) buyers' ability to use the unpaid purchase price for other purposes; and (3) the property's appreciation in value. 1994 WL 586833, at *2. The court declined to award seller interest on the unpaid purchase price because the buyers were willing to let the seller retain the rental

In short, if the court is to put the parties "nearly as possible in the same position as if the contract had been performed *according to its terms*,"[165] the court needs to account for both the present value of the interest rate differential *and* interest on the unpaid purchase price. Doing that here is essentially a wash. Stombaugh asserts that the present value of the interest rate differential is $83,656.13.[166] An award of simple interest on the unpaid purchase price at the legal rate of interest from early 2022 through today is $82,784.60.[167] Adding to the difficulties here, Stombaugh did not provide all of the necessary inputs to calculate the present value of the interest differential—there is no evidence in the record as to what down payment Stombaugh would have been required to

---

income instead of paying it over. *See id.* ("[D]uring the period of nonperformance, *both* parties benefited from their use of the assets they had contracted to exchange. Therefore, an order that requires them to exchange those assets now, while permitting them to retain the benefits produced by those assets, is fair and equitable, because neither party would gain at the expense of the other.") (emphasis in original).

[165] *Tri State*, 298 A.2d at 371–72.

[166] PX 45.

[167] The legal rate of interest in Delaware is 5% over the federal discount rate. *See* 6 *Del. C.* § 2301(a). The federal discount rate between March 16, 2020 and March 17, 2022 was 0.25%. *See* Federal Reserve Discount Window, *Primary and Secondary Credit Rates*, https://www.frbdiscountwindow.org/-/media/documents/primary secondary.xlsx?sc_lang=en&hash=B65867DA7B6731BF73623F3417357B9A; *see also* Federal Reserve Bank of St. Louis, *Rates Related to Monetary Policy*, THE FRED® BLOG (Apr. 15, 2024), https://fredblog.stlouisfed.org/2024/04/rates-related-to-monetary-policy/ (explaining that the Federal Reserve's primary credit rate is "often referred to as the discount rate"). Using a date range of January 1, 2022 through June 30, 2026, simple interest on the purchase price of the Property is $82,784.60. Compounded monthly, the interest would be $93,152.72. The court did the calculations itself using Microsoft Excel.

- 37 -

make on the mortgage in late 2021 or early 2022, so the actual amount of that loan is unproven.[168]

In considering the equities of an ancillary damages award, I conclude Stombaugh has gained greater benefit than defendants from the delayed performance of the Agreement. Indeed, it does not appear that respondents gained anything from their refusal to perform. Specific performance of the Agreement is warranted, but an award of interest-differential damages, in light of the foregoing, would amount to a windfall for Stombaugh that equity does not permit.[169] I therefore decline to award Stombaugh interest-differential damages.

## D.    The Request for a Court-Supervised Inspection Right

Stombaugh also requests "an Order requiring Defendants to permit Plaintiff access to the Property," with "contractors and other professionals of her choice to confirm the structure meets the terms of the Agreement and has

---

[168] Stombaugh testified only to the interest rate (3.625%) and the points she would have paid (1.25). *See* Trial Tr. 364–66. Stombaugh's March 2021 commitment letter (PX 43) identifies a 5% down payment, but also reflects a different interest rate, so its utility here is unclear. And her expert, Dr. Butkiewicz, used a 10% down payment amount for his calculations, *see* PX 45, but the record does not explain where the 10% came from. The figures for the new mortgage are also unclear. Stombaugh's expert assumed a 6.375% interest rate and 10% down payment (*see id.*), but on the first day of trial Gensoli testified that the interest rate was then 7.5% with a 20% down payment (*see* Trial Tr. 112).

[169] *Cf. Hastings Funeral Home*, 2022 WL 16921785, at *9 ("And, 'equity *may* require a party to pay interest on the purchase price as a condition to obtaining specific performance where one party would otherwise inequitably receive a windfall at the other's expense.") (quoting *Vaughan*, 1994 WL 586833, at *3) (emphasis in original).

been completed in a manner consistent with local industry standards[.]"[170] Stombaugh notes that "the Residence sat unfinished for some period of time between 2021 and 2024[.]"[171] During that time, she "observed the [Property]'s garage door [was] open and moss growing on the" Property's exterior.[172] Stombaugh argues that this, together with Ashburn's "wrongful escalation of the price," should entitle her to receive these a professional home inspection and air quality inspection.[173]

Defendants object to this request. They argue that granting Stombaugh's request would require the court to "supervise a personal service," which goes against "longstanding policy."[174] Defendants also argue that Stombaugh would have an adequate remedy at law—a damages claim—if Stombaugh discovers defects in the Property.[175]

I agree with Stombaugh that her request is not one for court supervision of a personal service. Stombaugh plainly requests the court order respondents to facilitate pre-transfer access to the Property.[176] That is a request for

---

[170] Dkt. 57 at 2.

[171] Pl. Alexis Stombaugh's Answering/Reply Post-Tr. Br. ("Pl.'s Reply Br."), Dkt. 73 at 54.

[172] *Id.*

[173] *Id.* 55.

[174] Defs.' Reply Br. 22.

[175] *Id.*

[176] *See* Pl.'s Reply Br. 54–55 ("Because the Residence sat unfinished for some period of time between 2021 and 2024, during which time Alexis observed the Residence's

injunctive relief separate from Stombaugh's request for specific performance of the Agreement. It does not require defendants' agents do any inspection themselves.

I award Stombaugh the relief sought. Defendants promised Stombaugh four meetings during construction: (1) a pre-construction meeting prior to breaking ground; (2) a pre-drywall meeting; (3) a pre-final walk meeting at least one week before settlement; and (4) a final walk meeting on the day of settlement.[177] The pre-drywall meeting is important—it is the homebuyer's final chance, after framing, electrical, plumbing, and HVAC (heating, ventilation, and air-conditioning) are "roughed in," to "identify and correct any observed material defects before they become hidden behind drywall, where they could be more costly and challenging to address." Int'l Assoc. of Certified Home Inspectors, *Pre-Drywall Inspection Standards of Practice*, https://www.nachi.org/sop-pre-drywall.htm (Mar. 6, 2025).[178]

---

garage door open and moss growing on the outside of the Residence, she requests an opportunity to have a more detailed inspection.").

[177] Agreement 11.

[178] *See also* Katherine Lutge, *How Pre-Drywall Inspections Work in New Construction Homes*, HOMES.COM (Feb. 25, 2026) ("It's very important to identify and address any underlying issues before installing the drywall, or the buyer may face costly problems later."); Carolina Premier Inspections, *Pre-Drywall Inspections*, https://www.carolinaphi.com/pre-drywall-inspections ("This is a narrow window of time that provides a certified home inspector the only opportunity to examine the 'bones' of the house—identifying structural defects, safety hazards, or installation errors that would be permanently hidden once the walls close up.").

As Stombaugh notes, defendants' unilateral decision to complete construction without any input from Stombaugh while in breach of the Agreement means no pre-drywall meeting is possible.[179] The pre-final walk meeting is, however, still possible and required under the Agreement. The only question is what it should entail. I find, under the circumstances of this case, where the Property sat unfinished for several years, during which Stombaugh observed the Property's garage door open and mold growing on the Property's external surfaces,[180] and where defendants did not give Stombaugh the pre-drywall meeting the Agreement requires, that Stombaugh's request to have a home inspector and air quality inspector, both of her choosing, inspect the Property prior to closing is appropriate.

## E.    Attorney Fees

Stombaugh requests "reimbursement of her attorneys' fees and costs in light of" defendants' "bad faith behavior both before and during this litigation."[181]

Delaware courts follow the American Rule, which means that "litigants are normally responsible for paying their own costs." *Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007). An exception to the American Rule

---

[179] Trial Tr. 187.

[180] *Id.* 69–70, 187.

[181] Pl.'s Reply Br. 69.

is where a party litigates an action in bad faith. *See, e.g.*, *New Start Hldgs., LLC v. Zhou*, 2024 WL 4039440, at *30 (Del. Ch. Sep. 4, 2024) (quoting *Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 506 (Del. 2005)). "Fee shifting under the bad faith exception may be appropriate 'if a prevailing party demonstrates that the losing defendants: [(1)] engaged in bad faith conduct that increased the costs of the litigation; or [(2)] engaged in pre-litigation conduct of a sufficiently egregious nature.'" *Enhabit, Inc. v. Nautic P'rs IX, L.P.*, 2024 WL 4929729, at *43 (Del. Ch. Dec. 2, 2024) (quoting *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 124 (Del. Ch. 1999)). "To find bad faith, a party must have acted in subjective bad faith, which involves a higher or more stringent standard of proof, *i.e.*, clear evidence." *Hastings Funeral Home*, 2022 WL 16921785, at *11 (citation modified). Stombaugh has shown clear evidence of Defendants' bad faith conduct sufficient to warrant fee shifting.

### 1. Pre-Litigation Conduct

"A litigant's conduct must rise to a level of 'glaring egregiousness' before this court will find bad faith for purposes of shifting fees, and 'merely being adjudicated a wrongdoer . . . is not enough to justify fee shifting.'" *In re Will of Grooms*, 2025 WL 1587960, at *2 (Del. Ch. June 5, 2025) (quoting *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 47 (Del. Ch. 2010)). This court has previously found a defendant's conduct glaringly egregious when it forces a plaintiff to file suit to secure a clearly defined and established right.

*See Pettry v. Gilead Scis., Inc.*, 2021 WL 3087027, at \*1 (Del. Ch. July 22, 2021) (quoting *McGowan v. Empress Ent., Inc.*, 791 A.2d 1, 4 (Del. Ch. 2000)). I conclude that defendants' pre-litigation conduct was glaringly egregious.

Defendants escalated the purchase price of the Property despite clear knowledge that doing so was in contravention of the Agreement.[182] Their agents refused to engage with Stombaugh when she attempted to resolve the issue amicably.[183] Instead of engaging, defendants threatened Stombaugh with termination of the Agreement and retention of her deposit, and falsely accused her of breaching the Agreement by failing to timely select options for the Property through L&L.[184]

Ashburn's pre-litigation actions—its bullying tactics, repudiation of its obligations, and assertion of the plainly frivolous counterclaim—caused Stombaugh to initiate this litigation to secure her bargained-for rights. Ashburn's pre-litigation actions were glaringly egregious and justify an award of attorney fees.

### 2. Litigation Conduct

"Courts have found bad faith for the conduct of litigation 'where parties have unnecessarily prolonged or delayed litigation, falsified records or

---

[182] *See, e.g.*, PX 32 at P-431.

[183] *See* Trial Tr. 52.

[184] *See supra* Part III.A.

knowingly asserted frivolous claims.'" *Hastings Funeral Home*, 2022 WL 16921785, at \*11 (quoting *Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 506 (Del. 2005)). Here, I conclude that defendants' conduct in the litigation justifies fee shifting.

In fairness to defendants, I first note that defendants did not unnecessarily prolong or delay this litigation. Defendants, albeit obliquely, proposed a settlement with Stombaugh.[185] Additionally, Stombaugh did not clearly show that defendants falsified records during this action.

Defendants' counterclaim and defense, however, smacks of frivolity. Defendants insisted on litigating Stombaugh's purported breach of the Agreement's "time is of the essence" clause regarding tile selection and L&L all the way through trial despite (1) their own agent and witness (McCann) making it clear there was no basis in the Agreement to support defendants' argument that Stombaugh was contractually obligated to select her final tiling options through L&L by March 17, 2021,[186] and (2) clear and indisputable evidence neither defendants nor their agents did not connect Stombaugh and L&L until long after the purported March 17 tile selection deadline.[187]

---

[185] Dkt. 25.

[186] *See* Trial Tr. 163–64.

[187] *See, e.g.*, PX 26.

To make matters worse, defendants' arguments shifted over time. On the second day of trial, defendants tacked on a new theory for why Ashburn was entitled to terminate the Agreement: Stombaugh's mortgage commitment was not satisfactory under the Agreement.[188] Defendants' shifting contentions further indicate a bad faith attempt to defend Ashburn's indefensible breach of the Agreement.[189]

But the frivolity of defendants' defense reached its zenith with the Price Escalation Addendum. On the first day of trial, McCann testified defendants deliberately imposed the price increase even though they knew they had already broken ground, and she was sure she discussed this with Mr. Ashburn before moving forward.[190] Then, six weeks later, on the second day of trial, Mr. Ashburn testified he had known Ashburn could not impose the price escalation and he directed defendants' counsel to withdraw it sometime before litigation

---

[188] *See* Trial Tr. 315–17; *see also* Defs.' Opening Br. 18–19; Defs.' Reply Br. 11–14, 22–24.

[189] *See Pearl Cty. Elevator, Inc. v. Gieseke*, 2021 WL 1099230, at *20 (Del. Ch. Mar. 23, 2021) ("Writing for the Seventh Circuit, Judge Posner observed that . . . when '[a] party . . . hokes up a phony defense to the performance of his contractual duties and then when that defense fails (at some expense to the other party) tries on another defense for size [he] can properly be said to be acting in bad faith.'") (quoting *Harbor Ins. Co. v. Cont'l Bank Corp.*, 922 F.2d 357, 363 (7th Cir. 1990)); *see also Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998) ("Since the Defendants constructed their entire defense in bad faith, the Court of Chancery did not abuse its discretion in awarding Vendel his full reasonable attorney[] fees.").

[190] Trial Tr. 252.

was filed.[191] The record is clear that no such retraction was ever made. So one of two things must be true: (1) Mr. Ashburn testified truthfully, defendants' counsel ignored his direction, and defendants forced Stombaugh to litigate this issue despite knowing they did not have a good faith basis to maintain the defense; or (2) Mr. Ashburn testified untruthfully, he never gave that direction to defendants' counsel, and the testimony is a misguided attempt to deflect blame onto defendants' counsel without providing any evidence to back up the assertion. Whichever of these is true, it is litigation "so strained and wholly at odds with the operative reality that it [falls] outside the bounds of good faith advocacy." *In re Grupo Dos Chiles LLC*, 2006 WL 2507044, at *2 (Del. Ch. Aug. 17, 2006) (citing Ct. Ch. R. 11).

*        *        *

Defendants' pre-litigation conduct was glaringly egregious. Defendants' insistence on asserting their baseless breach defense and counterclaim cost the parties and the court time and the expenditure of valuable resources. Defendants' unwillingness to yield to reality constitutes bad faith litigation conduct and warrants fee shifting. Accordingly, I grant Stombaugh's request for fee shifting.

---

[191] *Id.* 338–39.

## IV. CONCLUSION

For the foregoing reasons, Stombaugh has shown her entitlement to an order of specific performance directing defendants to convey the Property to her. I decline to grant her additional damages request, but grant her request for a more thorough inspection of the Property prior to conveyance. Defendants' counterclaim fails, and I recommend Stombaugh's fees be shifted to defendants. Stombaugh must submit a Rule 88 affidavit if the parties cannot agree on the reasonableness of her attorney fees. Stombaugh is the prevailing party, so I award her costs under Court of Chancery Rule 54(d).

This is a Report under Court of Chancery Rule 144(b)(1). Because the court has awarded Stombaugh attorney fees in an amount to be determined, this Report does not conclude this action so it is not a Final Report.[192] Exceptions to this report are stayed pending entry of my Final Report.

---

[192] *See Delaware Bay Surgical Servs., P.A. v. Swier*, 869 A.2d 327 (Del. Feb. 15, 2005) (TABLE) ("This Court consistently has held that that a judgment on the merits is not final until an outstanding related application for an award of attorneys fees has been decided.") (citing *Lipson v. Lipson*, 799 A.2d 345, 348 (Del. 2001)).